**LUCAS AEROSPACE, LTD., Plaintiff,**

**v.**

**UNISON INDUSTRIES, L.P., Defendant.**

**Civ. A. No. 93–525 MMS.**

United States District Court,
D. Delaware.

Sept. 5, 1995.

Robert H. Richards, III, Richards, Layton & Finger, Wilmington, Delaware, Karen L. Hagberg, Carroll E. Neesemann, and Nancy R. Thomas, Morrison & Foerster, New York City, for plaintiff.

William J. Marsden, Jr., and Joanne Ceballos, Potter Anderson & Corroon, Wilmington, Delaware, Berton Scott Sheppard, Charles H. Mottier, and John B. Conklin, Leydig Voit & Mayer, Chicago, Illinois, for defendant.

MURRAY M. SCHWARTZ, Senior District Judge.

Lucas Aerospace, Ltd. ("Lucas") commenced this action seeking a declaratory judgment of invalidity and non-infringement of four United States Patents held by Unison Industries Limited Partnership ("Unison"), as well as asserting claims sounding in antitrust and unfair competition. *See* Docket Item ("D.I.") 63 (Amended Complaint). Unison's patents cover a class of devices known as ignition exciters, or 'igniters,' that generate sparks to ignite fuel in turbine engines. *See* U.S. Patent 5,065,073 [1]; U.S. Patent

---

1. The '073 patent describes the invention as an 'ignitor,' while the remaining three patents use

5,155,437; U.S. Patent 5,245,252; U.S. Patent 5,343,154. The Court conducted a twelve-day jury trial on the patent issues after severing the antitrust and unfair competition claims. Because the parties presented extrinsic evidence to explain disputed language in the patent claims, the Court permitted the jury to construe the claim language; after construing the claim language, the jury rendered its verdict. *See* D.I. 373.

Following the jury's verdict, but before the Court entered judgment, the Federal Circuit Court of Appeals held "that in a case tried to the jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (in banc), *petition for cert. filed,* 64 U.S.L.W. 3068 (July 3, 1995). Accordingly, at the request of both parties, the Court construed the patent claims at issue as a matter of law. *See* D.I. 378 (*Lucas Aerospace, Ltd. v. Unison Industries, L.P.,* 890 F.Supp. 329 (D.Del. 1995)); D.I. 379 (Order). The Court then entered judgment. *See* D.I. 386.

Lucas has now filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and an alternative motion for a new trial pursuant to Federal Rule of Civil Procedure 59. Lucas seeks to overturn the Court's claim construction as a matter of law; the jury findings on infringement, validity and inventorship; and the Court's ruling as a matter of law on Lucas's equitable estoppel defense. Lucas also attacks the Court's conduct of the trial. *See* D.I. 393. Similarly, Unison has renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and asks the Court to set aside the jury's finding that '073 patent claims 1 and 2 are invalid as obvious. *See* D.I. 395. This Court has jurisdiction pursuant to 28 U.S.C. § 1338. The Court will address the numerous issues raised in the parties' motions *seriatim.*

the term 'igniter.' The Court will use the latter spelling except for the quotations from the '073 patent.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 50(b) permits a party to "renew," after the Court has entered judgment, a motion for judgment as a matter of law that the Court has previously denied or for any reason not granted. To evaluate a party's motion for judgment as a matter of law, the Court "must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor when *the correct legal standard is applied.*" *Markman v. Westview Instruments, Inc.,* 52 F.3d at 975 (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 756 F.2d 1556, 1560 (Fed. Cir.1985)) (brackets in original). In other words, the Court must assess "whether the jury's express or implied findings of fact are supported by substantial evidence." *Baxter Healthcare Corp. v. Spectramed, Inc.,* 49 F.3d 1575, 1582 (Fed.Cir.1995) (citation omitted), *petition for cert. filed,* 64 U.S.L.W. 3908 (June 15, 1995).

To make its assessment, the Court must "(1) consider all of the evidence; (2) in a light most favorable to the non-moving party; (3) drawing all reasonable inferences favorable to that party; (4) without determining credibility of the witnesses; and (5) without substituting its choice for that of the jury's in deciding between conflicting elements of the evidence." *Verdegaal Bros., Inc. v. Union Oil Co.,* 814 F.2d 628, 631 (Fed.Cir.) (citing *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1512–13 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984)); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1546 (Fed.Cir.1983), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987). "Factual findings made by the jury ... are to be upheld unless the [movant] ... shows that (when the correct legal standard is applied) there is not substantial evidence to support a finding in favor of the nonmovant." *Markman v. Westview Instruments, Inc.,* 52 F.3d at 975; *see also Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821 (Fed. Cir.1992) (holding the Court may not discard a finding of fact unless the movant "shows

that on the entirety of the evidence of record, including that which detracts from the weight of the favorable evidence, and taking into account the required quantum of proof, no reasonable juror could have made the finding"). Finally, the Court must "review the issues of law necessary to the verdict," *id.*, and decide whether the jury's factual findings support the verdict under the properly found law, *Markman v. Westview Instruments, Inc.*, 52 F.3d at 975.

Rule 50(b) also permits a party to join a motion for a new trial pursuant to Federal Rule of Civil Procedure 59 with that party's renewed motion for judgment as a matter of law. While permissible grounds on which to grant a motion for a new trial vary widely, these grounds converge upon the central theme of "whether an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair." *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 427 (Fed.Cir. 1986); *see also Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1245 (Fed.Cir.) ("In order to vacate the jury's verdict ... and grant a new trial thereon, the trial court must find that the jury's verdict 'is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice.' ... It is insufficient that the district court would simply have reached a different verdict.") (internal citations omitted), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *cf. Williamson v. Consolidated Rail Corp*, 926 F.2d 1344, 1353 (3d Cir.1991) ("new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience") (citation omitted).

## II. CLAIM CONSTRUCTION

■ The analysis of whether a patent is infringed proceeds in two steps. First, the Court must properly determine the meaning and scope of the patent claims. Second, the allegedly infringing device must be compared to the properly construed claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d

at 976. The first issue posed by Lucas's Rule 50(b) motion is whether the Court properly construed the meaning and scope of the patent claims at issue. Lucas argues the Court erroneously interpreted all aspects of the disputed claim language which the Court resolved against the claim construction proposed by Lucas. The Court will address each of Lucas's arguments in turn.

A. *'073 Patent Claim 1*—"a voltage converter for receiving a low voltage from a system source and converting it to a high DC output voltage"

■ Lucas claims that the Court erred as a matter of law by holding that this claim language means "that the voltage converter produces a high DC output voltage to some value relatively greater than the convertor input." *Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 342. Lucas contends the Court's construction of this language is in error because "[h]ad Unison intended the 'high' [DC output voltage] to be in reference to the 'low' voltage from the system source, then the proper way to draft the claim language would have been to use the term 'relatively high voltage.' " D.I. 394 at 15. Lucas also argues that because Unison used a relative term in the claim language, the Court must refer to the patent specification to interpret this disputed claim language. *Id.* at 16. Finally, Lucas argues that the Court must define the phrase "high DC output voltage" in reference to the preferred embodiment because "no other element of claim 1 addresses a boosting of the voltage to obtain the high voltage that is required to fire the plug." *Id.* at 17.

These arguments fail to demonstrate that the Court has erred in its interpretation of this claim language. First, Lucas offers no valid support for its proposition that "the proper way to draft the claim language" would have been to use the term "relatively high voltage." *Id.* at 15 (citing Steven A. Becker, *Patent Applications Handbook 1995 Edition*, Section 6.04[4] at 6–31 (1995 ed.)). As Lucas's citation to the *Patent Applications Handbook* suggests, when the patentee uses relative language in the patent claims, the relative language must have a point of

reference for comparison. Claim 1 of the '073 patent provides a comparator for the 'high DC output voltage,' the voltage converter input received from the system source. '073 Patent, col. 15 at ln. 66–68. Lucas's suggestion that Unison should have used the term 'relatively' to connote a comparison between the voltage converter output and the voltage converter input does not change the meaning of the claim language. Contrary to Lucas's suggestion, if the claim had read "a voltage converter for receiving a *relatively* low voltage from a system source and converting it to a *relatively* high DC output voltage output," the word 'relatively' would modify 'low' and 'high' in the phrase but would not provide any further datum to compare the voltage converter inputs and outputs. Furthermore, when the claim uses the phrases 'relatively slow current rise,' *id.*, col. 16 at ln. 17, and 'relatively fast di/dt,' *id.*, col. 16 at ln. 21–22, the word 'relatively' does not provide a point of reference for the comparison between the two values but modifies the rate of current rise, or 'di/dt,' just as the words 'fast' and 'slow' do.

The Court's construction of the claim also comports with language from the *Patent Applications Handbook* that Lucas omitted from its brief. According to the *Patent Applications Handbook* at 6–32 "[t]he language, 'said inverter having a threshold within the range of .4 to .7 volt' would be favorably received by the examiner. However, this limitation is usually excessively narrow. It would be preferable to define the threshold as being relative to another level in the claim, e.g., 'said first inverter having a threshold higher than that of second inverter.' ". That is exactly what Unison has done in this claim. In sum, the Court finds nothing ambiguous about this claim language that requires reference to the specification.

Citing *Intervet America, Inc. v. Kee–Vet Lab., Inc.*, 887 F.2d 1050 (Fed.Cir.1989), Lucas nevertheless urges the Court to interpret the claim language in light of the patent specification because the disputed claim language contains a relative term. *Intervet America, Inc. v. Kee–Vet Lab.* stands for a different proposition. Far from requiring a quantitative definition of all relative terms by

reference to the specification, the *Intervet America* court found that the district court erred by reading a relative limitation into the claim that "mean[t] nothing without knowing the reference point from which attenuation [the extraneous limitation] is being measured." *Id.* at 1055; *see also id.* ("Here again, . . . the court was reading limitations into the claims which cannot be found there; . . . it was reading them in from remarks made by the attorney in the course of arguing distinctions from a cited reference. We have set forth the asserted claims in full above and it is clear that they make no reference whatever to attenuation."). Furthermore, even if *Intervet America* did stand for the proposition cited by Lucas, Lucas's suggested reference to the patent specification does not support its position that "800 volts [the Lucas devices' voltage convertor output] could never qualify as a 'high output voltage.'" D.I. 394 at 16 (citing '073 Patent, col. 1 at ln. 47). Column 1 line 47 discusses 1000 volts as a low voltage for creating sparks at the igniter plug. In contrast, the claim language at issue involves low voltages coming from a system source and not low voltages for igniting sparks; the phrase 'low voltage' when used in the context of igniting fuel simply does not relate to the system source voltage. *See also Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 334 (noting that most aircraft electronic supply voltages are 28 volts, which, when compared to either 1,000 or 2,500 volts, *is* 'low').

Finally, in a refinement of its earlier arguments, Lucas contends the phrase 'high DC output voltage' and the phrase 'a high voltage,' as used in the fifth element of the '073 patent, must have the same values because '073 patent inventor John Frus testified that his invention, or at least the preferred embodiment of his invention, uses approximately the same voltage at the plug as is produced at the voltage converter. The structure of claim 1 belies this assertion. First, if the patentee had desired that these two phrases have the same meaning, the patentee would have used the phrase "the high DC output voltage (or the high voltage from the voltage converter) appears across the gap of the igniter plug. . . ." *Cf. Tandon*

*Corp. v. United States Int'l Trade Comm'n,* 831 F.2d 1017, 1023 (Fed.Cir.1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims") (discussing the doctrine of claim differentiation).

Second, and more importantly, claim 1 of the '073 is an open-ended claim comprised of a series of elements. As such, if an allegedly infringing device contains all of these elements, that device would be considered to infringe the patent, even if the device includes additional structures. *Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 1482 (Fed.Cir.) ("Modification by mere *addition* of elements of functions, whenever made, cannot negate infringement") (citations omitted), *cert. denied,* 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). An additional structure to boost the voltage converter output to a higher voltage as seen at the igniter plug is not precluded by the language of claim 1. In sum, Lucas has not demonstrated that the Court has erred as a matter of law in its construction of the phrase "high DC output voltage."

B. *'073 Patent Claim 1*—"solid state means . . . such that the following sequence of event [sic] occurs"

■ Previously, the Court held as a matter of law that this claim language "requires only that the solid state means create the sequence of events described in the claim," rejecting Lucas's argument that the sequence of events requires a waveform as illustrated in '073 Patent Figures 3b and 4 (curve B).[2] *Lucas Aerospace, Ltd. v. Unison Industries, L.P.,* 890 F.Supp. at 342. Lucas now asserts that the Court's claim construction reads on the prior art. D.I. 394 at 19. Lucas reaches this conclusion by arguing that Figure 4 (curves B and C), which represent current waveforms produced by the prior art, both show "a slight period of low di/dt followed by a period of high di/dt and thus

would fall within the described sequence of events." *Id.* at 20. From this analysis, Lucas concludes that the distinction between the invention, which requires relative slow current rise followed by relatively fast current rise, and the prior art, as evidenced in Figure 4 (curves B and C), is not found within the words of the claim as construed by the Court.

This argument fails to account for the portions of the claim language other than the descriptors of the rate of current rise. In addition to requiring a relatively slow current rise followed by a relatively fast current rise, the fifth element of claim 1 requires, for example, a high voltage across the gap of the igniter plug that begins to create a plasma; initiation of a relatively slow current rise during transition of a solid state switch from first to second state while sustaining the high voltage across the gap of the igniter plug; and, most importantly, saturation of magnetically saturable core inductor "thereby completing the generation of a spark across the gap." '073 Patent, col. 16 at ln. 15–24. In other words, not only must the changes in the current rise appear, but they must appear in the circuit having the components recited in the claim language.

As stated previously, the physical and electrical characteristics of the components implementing this element of the claim may well create a waveform that, on a strictly comparative basis, looks more like Figure 4 (curve B or C) than Figure 4 (curve A). Likewise, on a strictly visual basis, an ignition exciter with an air core inductor may create a waveform that looks more like Figure 4 (curve A) than Figure 4 (curves B and C). But looking solely at these illustrations, i.e., the visual descriptions of what the sequence of events in the fifth element of the claim is to produce, does not account for the infinite possible permutations of the ultimate waveform shape. What will bring a device within the purview of the disputed claim

2. The parties agreed at trial that Figure 4, as it appears in both the '073 patent and the '252 patent, contains a mistake in the key. Figure 4 associates the incorrect letter designation with the curve descriptions in the key. The solid line, for example, represents an actual current waveform for the invention implemented with a satur-

able core inductor and is labeled 'A' in the plot. The key, however, incorrectly associates the letter 'B' with the saturable core inductor and the solid line. The parties and the Court use the letter associated with the current waveform in the plot rather than the incorrect letter designation in the key.

language is a low current rise followed by a fast current rise *and* the other items included within the claim language.

In the end, the curves are illustrative of the typical differences between air core and saturable core inductors implementing the waveshaping scheme. Mere similarity to one curve or the other does not make a device infringe; to measure infringement on the basis of Figure 4 alone would allow a device with all of the elements of claim 1 of the '073 patent, performing all the functions required by the claim language, to be non-infringing if it could be demonstrated that the device's waveform tracked more closely to Figure 4 (curve B or C) than to Figure 4 (curve A). The difference between an infringing and non-infringing device is not solely in the shape of the curves, but also in the way that the invention generates the curves.

C. *'073 Patent Claim 17*—"a sensor incorporated into said inductive device"

■ The Court construed this language to mean "any inductive device incorporating a sensor 'providing a diagnostic signal having electrical characteristics that represent the electrical and magnetic events occurring at the gap of the ignitor plug during the period of energy transfer to spark across a gap of the ignitor plug' that is placed in the ignition system in accordance with the requirements of the claim." *Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 342. In reaching this conclusion, the Court rejected Lucas's argument that the patent specification limits the phrase "said inductive device" to saturable core inductors. *See id.* at 337–38. Lucas now abandons this argument and contends that the Court erred in its claim constructions not because the sensor required by claim 17 must be a saturable core inductor, but because the sensor in claim 17 must be "the *same* inductor that is creating the 'sequence' described in claim 1." D.I. 394 at 28. Because, Lucas concludes, "claim 17 does not refer to a saturable core inductor" but instead refers to the inductor that creates the sequence of events described in claim 1, the Court's claim differentiation analysis, *see Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 337–38, was in error.

This is the first time that Lucas has raised this argument; it did not advance this contention either at trial or in its papers on claim construction. When the Court construed claim 17, for example, Lucas never attempted to equate the inductor in claim 17 to the inductor in claim 1. Similarly, Lucas did not try its case under this theory. Nevertheless, the Court has examined the merits of Lucas's argument and finds them lacking. First, Lucas never states why it believes the inductor of claim 17 must be the same inductor as that which creates the "sequence" found in claim 1. Instead, Lucas rehashes its previous rationale for concluding that the inductor of claim 17 must be a saturable core inductor. *Compare* D.I. 394 at 28–29 (discussing the '073 specification at columns 9 and 10) *with* D.I. 367 at 6 (same). The Court has already addressed this argument and on this basis finds no error in its construction of claim 17.

■ Second, Lucas's suggestion that the Court's claim construction permits the patent to cover auxiliary transformers that are, according to Lucas, within the prior art is without merit. While the description of the preferred embodiment does state that auxiliary voltage transformers are "typically … used" to sense current and voltage, the description of the preferred embodiment does not state that they are typically used in igniter technology. *See* '073 Patent, col. 10 at ln. 2–16. In fact, the only testimony at trial as to this issue suggested that ignition exciters had never previously incorporated sensors to provide diagnostic signals as to igniter plug health. *See* D.I. 403 at 772–82 (noting that igniter diagnostics internal to the igniter were unknown in the art prior to Unison's invention) (testimony by inventor Frus); *see also* '073 Patent, col. 10 at ln. 4 (suggesting that auxiliary transformers were not then used in exciter circuits due to insertion losses and physical difficulties in placing the component within an igniter circuit).

Thus, while the description of the preferred embodiment indicates the inventor believed that a sensor incorporated into the saturable core inductor was superior to use

of an auxiliary transformer, neither the claim language nor the extrinsic evidence adduced at trial suggests that use of an auxiliary transformer for sensing in an ignition exciter was obvious or common to one skilled in the art of igniter design. Because Lucas did not try the case under this theory, there is no evidence to support it, and, other than using the description of the preferred embodiment to suggest that the inductor referenced in claim 17 is the same inductor that creates the sequence of events in claim 1, i.e., the saturable core inductor, Lucas offers no basis on which to conclude that the claim 17 inductor is the same inductor that creates the sequence in claim 1. Nothing in the structure of either claim 17 or claim 1 dictates that result. Furthermore, the fact that the preferred embodiment uses the same inductor in both roles does not dictate that result. The carefully selected claim language, passed upon by the Patent and Trademark Office, does not require a saturable core inductor. The Court finds no reason to believe that its construction of claim 17 was in error.

**D.** *'252 Patent Claim 1*—"waveshape the voltage and current in order to efficiently ignite the fuel in the turbine engine"

■ The Court construed this language to mean that the invention must "produce 'a current waveform ... which initially rises relatively slowly, followed by a transition to a fast rising current which quickly peaks and thereafter slowly dissipates.'" *Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 342. As with claim 1 of the '073 patent, Lucas argued to the Court that the phrase 'waveshape the voltage and current' meant to produce a waveform similar to that depicted in Figures 3b and 4 (Curve A) of the '252 patent. *See id.* at 339. Lucas now repeats the same arguments which it made with respect to claim 1 of the '073 patent. In essence, Lucas suggests that the Court's claim construction encompasses waveforms demonstrated in Figure 3a and Figure 4 (curves B and C) and that, therefore, the Court's claim construction is "too broad since it would cover prior art and invalidate the claim." D.I. 394 at 33.

Lucas's arguments fail for the same reason they failed with respect to the '073 patent. Figure 3b represents the generalized shape of a saturable core inductor's current waveform. Figure 4 (curve A) represents the preferred embodiment's waveshape in comparison to the preferred embodiment implemented with an air core inductor. Once again, Figure 4 (curve A) is representative of just one permutation of the waveforms that could be created by a network with varying electrical and physical characteristics. The fact that Figure 4 (curves B and C) also have an initially slow current rise does not indicate that the claim construction is over broad; it merely demonstrates that the waveform characteristics of the '073 invention implemented with an air core inductor cannot match the theoretical characteristics of an air core inductor demonstrated in Figure 3a. More importantly, the differences between the two sets of waveforms, particularly in Figure 3, help to define what is meant by the claim language describing the change in the rate of current rise. The differences in the two sets of illustrations, however, do not act as an invitation for alleged infringers to argue that their waveform looks more like one curve than the other curve, thereby ignoring the more important and defining aspect of the invention, the components required in the language of the claim that create the waveform. The Court thus concludes, once again, that Lucas has demonstrated no error in the Court's construction of the '252 Patent claim 1.

**E.** *'437 Patent Claim 21*—"[a]n ignition system having the ability to diagnose the state of health of an igniter plug"

 *'154 Patent Claim 1*—"a diagnostic circuit responsive to the exciter and igniter plug detectors for reporting a failure of the igniter plug only when ... the sparks are not being produced at the igniter plug, the diagnostic circuit including an output for reporting the state of the health of the ignition system"

 *'154 Patent Claim 1*—"an igniter plug detector for detecting whether the high energy pulses produce sparks at the igniter plug"

■ The Court construed these claims to mean that the diagnostic system must only

detect an open circuit failure at the plug and need not detect all plug failures. *Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 342. Lucas now argues that the Court has construed these claims in a manner that does violence to the plain meaning of the claims. *See* D.I. 394 at 45–46. The Court rejects this suggestion and finds no error in its claim constructions. First, as stated in the Court's earlier opinion, Lucas's contention that the claims require detection of short circuit conditions at the plug would render both patents invalid for failure to disclose the invention adequately. *See Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 341. Second, with respect to both patents, what Lucas now wants to do is add a positive, or inclusive, limitation to the claims of the patent that is not found in the specification of either patent. As the Court noted previously, both the specification and the extrinsic evidence adduced at trial are consistent with the conclusion that the claim language does not require a device within the scope of the patent to detect all failures of the plug and that, consequently, a system that detects the open failure mode, or a system that determines sparks are not being produced by looking and asking the plug whether sparks are being produced, would fall within the purview of the patent.

### F. Impact of Claim Construction on the Jury's Deliberations

■ In its brief supporting its motion for judgment as a matter of law, Lucas argues that the Court's claim construction "took away from the jury the opportunity to consider the validity of the claims in light of their substantially broadened legal meaning."

D.I. 394 at 49. Specifically, Lucas argues that had it "known that the Court would construe the claim language in such a broad way, it would have had the opportunity of describing the relevance of the [prior] art in light of the claim's [sic] breadth." *Id.* at 50. The Court finds this proposition without merit.[3]

If Lucas's trial strategy was to ignore the possibility Unison might prevail on some or all of the contested issues of claim construction, it cannot now complain. Both parties entered the case not knowing how the disputed claim language would eventually be construed, and Lucas chose not to present its validity case in reference to the claim constructions advocated by Unison. In other words, Lucas chose to try its case assuming that it would prevail on every issue of claim construction. Lucas certainly knew at least the broad possibilities of how the disputed claims could be construed, and where the Court has rejected Lucas's claim construction, it has construed the claims roughly to the parameters advocated by Unison.[4] In the end, had the Court never construed the claims as a matter of law, Lucas would be the same position it is now. Therefore, because Lucas has failed to establish an error so grievous that the jury's verdict has become unfair, the Court rejects Lucas's application for a new trial on this ground.

### III. JURY FINDINGS— INFRINGEMENT

#### A. Literal Infringement

■ Lucas moves for a judgment as a matter of law reversing the jury's findings that Lucas exciter SL20011 [5] literally infring-

---

3. Lucas does not argue that the Court's claim construction as a matter of law presents any prejudice to Lucas with regard to the jury's findings of infringement.

4. Lucas grossly overstates the impact of the construction of 'waveshape the voltage and current' in claim 1 of the '252 patent. Far from being broader than the construction Unison sought, the quoted phrase does no more than respond in words to Lucas's overly restrictive proposal that waveshape means to create a current waveform shaped in the manner as that depicted in '252 Patent Figures 3b and 4 (curve A). The Court's word picture of the current waveform shape does

not, as the Court previously stated, "relieve the network of the requirement to waveshape as detailed by the specification." *Lucas Aerospace, Ltd. v. Unison Industries, L.P.*, 890 F.Supp. at 340. The Court also rejects Lucas's implicit suggestion that the jury should have the opportunity to measure validity against the words the Court uses to explicate the meaning of the claims, rather than the claims themselves.

5. The complete model number is SL20011–01. For the sake of brevity and clarity before the jury, the parties referred to this product as the SL20011 throughout the trial. The Court will continue this abbreviated form in this opinion.

ed claims 1 and 2 of the '073 patent, claims 8 and 21 of the '437 patent, and claims 1 and 3 of the '154 patent. To prove literal infringement, Unison carried the burden at trial to prove by a preponderance of the evidence that the SL20011 includes each and every element found in Unison's patent claims. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995) (citing *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed.Cir.1990)). Because Unison prevailed on these issues, the Court will consider the evidence in a light most favorable to Unison and assess whether the jury's findings of fact are supported by substantial evidence. *See supra* text at 1272. The Court finds substantial evidence to support the jury's findings of literal infringement.

Lucas raises three issues with respect to claims 1 and 2 of the '073 patent. First, Lucas argues that its device does not have a voltage converter that receives a low voltage and converts it to a high voltage. Lucas continues to maintain that because its voltage converter only steps up the aircraft system voltage to 800 volts, but the plug sparks at the higher voltage of 3000 volts, the SL20011 does not literally infringe. The Court finds substantial evidence to support the jury's finding that the SL20011 voltage converter receives a low voltage and converts it to a high DC output voltage. As Lucas's brief concedes, the uncontroverted trial testimony stated that "the Lucas Aerospace voltage converter steps up an input voltage to a relatively higher voltage." D.I. 394 at 22; *see also* D.I. 409 at 1061 (testimony of Unison expert Burton). Lucas's suggestion that the SL20011 voltage converter does not step up the low input voltage to the voltage seen at the plug is beside the point. Lucas has argued, albeit obliquely at times, that claim 1 requires that the voltage converter output be the same voltage seen at the igniter plug. Claim 1 does not impose such a limitation, however, *see supra* text at 1274–75, and Lucas's factual argument is without merit.

Second, Lucas contends the waveform produced by SL20011 more closely mirrors '073 Patent Figure 4 (curves B and C) than '073 Patent Figure 4 (Curve A), and that, there-

fore, the SL20011 does not infringe. *See* D.I. 394 at 22–23. This argument bears no weight in light of the Court's construction of the claim language relating to the sequence of events. Moreover, substantial evidence exists to support a conclusion that the SL20011 literally infringes the '073 patent, even under the erroneous assumption that the '073 patent requires a current waveform that most closely approximates Figure 4 (curve A). Numerous actual tests and theoretical models showed SL20011 waveforms with a low initial di/dt, followed by a fast di/dt that comport with the theoretical waveform in Figures 3B and 4 (curve A). The Court will not substitute its judgment as to the identity of the waveforms for that of the jury.

Finally, Lucas argues that Unison should be "bound by the admissions of its expert that a device exhibiting the waveform of Figure 3a or 4 (curve B or C) does not infringe." D.I. 394 at 23. Under the standard of review, the Court is not bound to accept this statement, and this statement does not preclude a jury finding adverse to Lucas. Furthermore, Lucas does not assert that no substantial evidence exists to support a finding that the sequence of events exists in the SL20011 as required by the '073 patent or that the jury's finding of infringement, predicated on an erroneous claim construction, is subsumed by the correct construction of claim 1 of the '073 patent. Because Figures 3b and 4 (curve A) illustrate the sequence of events in claim 1, and because substantial evidence exists for the jury to find the SL20011 exhibited the waveforms of Figures 3b and 4 (curve A), the Court finds no reason to disturb the jury's verdict.

Lucas's arguments that the jury's findings of literal infringement on the '437 and '154 patents are against the weight of the evidence are dependent on Lucas's arguments *vis-a-vis* the correct claim construction of these patents. Lucas argues that the SL20011 cannot detect short circuit failures of the plug and thus cannot detect whether sparks are being produced at the igniter plug, '154 patent claims 1 and 3; diagnose the health of an ignition system, *id.;* or diagnose the state of health of an igniter

plug, '437 patent claim 21. In light of the correct claim construction as a matter of law, these contentions are meritless because neither patent requires detection of short circuit failures of the plug. Furthermore, although Lucas does not base its motion on the quanta of evidence supporting the jury's verdict, substantial evidence exists to support the jury's finding of literal infringement of both patents. All evidence at trial indicated that the SL20011 can and does detect open circuit failures at the plug. On that basis, ample evidence existed for the jury to conclude the SL20011 literally infringed the '154 and '437 patents.

## B. Doctrine of Equivalents

■ The jury found that Lucas exciter SL10001 infringed claims 1, 2, and 3 of the '073 patent and claims 1, 3, 4, 5, 7, and 8 of the '252 patent under the doctrine of equivalents. The jury also found that Lucas exciter SL20011 infringed claim 17 of the '073 patent and claims 1, 3, 4, 5, 7, and 8 of the '252 patent under the doctrine of equivalents. See D.I. 373. Lucas challenges the evidentiary bases for these findings on the grounds that "Unison failed to present the 'particularized testimony and linking argument' required to send its doctrine of equivalents claims to the jury," D.I. 412 at 6; see also D.I. 394 at 8, and that Unison failed to present evidence to "support a finding that the Lucas Aerospace devices contain the substantial equivalent of each of the claim limitations of the '252 or '073 patent [sic] or that they operate in the same way as the claimed inventions." D.I. 394 at 11. Additionally, Lucas makes the legal argument that the jury's findings of infringement under the doctrine of equivalents would permit Unison to obtain coverage in its patents beyond that which could have been obtained with literal claims from the Patent and Trademark Office because literal claims sufficient in scope to cover Lucas's exciters would read on the prior art. Id. at 11–12.[6]

■ Generally, the "application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard" and viewed from "the vantage point of one of ordinary skill in the relevant art." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512, 1518, 1519. Just as with literal infringement, the patentee must prove by a preponderance of the evidence that each element of the patent, or its substantial equivalent, exists in the accused device. *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985). In other words, the factfinder may conclude a device infringes under the doctrine of equivalents "if an equivalent of a recited limitation has been substituted in the accused device." *Malta v. Schulmerich Carillons, Inc.,* 952 F.2d 1320, 1325 (Fed.Cir. 1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992). As part of the patentee's proof of the existence of the substantial equivalents of an element of the patent in the accused device, the patentee also must present particularized testimony and linking argument to provide guidance to the jury in its application of the doctrine of equivalents. *Lear Siegler, Inc. v. Sealy Mattress Co.,* 873 F.2d 1422, 1426 (Fed.Cir.1989). In essence, *Lear Siegler, Inc. v. Sealy Mattress Co.* adds no substantive requirements to prove infringement, but "merely requires that a patentee prove all elements of his case, which, with respect to the doctrine of equivalents, means that a patentee must prove that each prong of the *Graver Tank* equivalency test is met." *Malta v. Schulmerich Carillons, Inc.,* 952 F.2d at 1328.

■ The factfinder traditionally evaluates the substantiality of differences between the claimed invention and the accused device in terms of function, way, and result. *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). Other factors also provide relevant gauges to assess whether or not the differences between the claimed invention and the accused device are insubstantial.

---

**6.** Lucas also asserts that Unison failed to present an equitable basis to support application of the doctrine of equivalents against Lucas. *Id.* at 12–14. The Federal Circuit Court of Appeals' recent decision in *Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d 1512 (Fed.Cir.1995) (per curiam) (in banc), forecloses this argument.

For example, "[t]he known interchangeability of the accused and claimed elements is potent evidence that one of ordinary skill in the art would have considered the change [in elements] insubstantial." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.,* 62 F.3d at 1519. Independent development of an infringing product "does not excuse infringement of the patent owner's right to exclude" and "provides no information about the substantiality of the differences" between the accused device and the patented invention. *Id.* at 1520. Finally, "culpable conduct ... is not a prerequisite nor necessary for application of the doctrine." *Id.* at 1519.

■ Before turning to the jury's findings, the Court notes that Lucas has for the most part chosen not to argue deficiencies in Unison's presentation of infringement evidence, but instead has constructed a mixed legal and factual argument on why Lucas believes its devices do not infringe Unison's patents. As a consequence, much of its argument is seemingly directed as if the Court were deciding the factual issues of infringement in the first instance. Lucas's rationale for believing its devices do not infringe was properly directed toward the factfinder, not the Court; the Court will not disturb the jury's findings of infringement unless substantial evidence does not exist to support those findings or unless the jury's verdict is contrary to the clear weight of the evidence. Pursuant to Rule 50(b), Lucas must, in the first instance, clearly identify and pursue in its brief any area where it deemed substantial evidence lacking to support the jury's finding of fact. Where Lucas raises questions of sufficiency of the evidence, the Court addresses them.

Lucas challenges the evidentiary basis underlying the jury's findings of infringement under the doctrine of equivalents by the SL10001 with respect to four portions of claims 1, 2, and 3 of the '073 patent: the voltage convertor's high DC output voltage, the required sequence of events, unipolarity, and the saturable care inductor. *See* D.I. 394 at 21–26. As discussed with respect to literal infringement of the SL20011, substantial evidence exists for the jury to conclude the SL10001 has a voltage converter that converts a low input voltage to a high DC output voltage. Lucas's contention that the SL10001 achieves a high voltage at the plug in a different manner than the claimed invention is of no moment because it derives from a construction of claim 1 that is incorrect as a matter of law and because substantial evidence exists to conclude the SL10001 contains exactly the same elements described by the patent claims. *See supra* text at 1278–79.

Next, Lucas argues that under Lucas's proposed construction of the 'sequence of events,' no basis exists for the jury to conclude the SL10001 infringes the '073 patent. Lucas's proposed construction of the 'sequence of events' is incorrect as a matter of law. Further, Lucas does not assert that no substantial evidence exists for the jury to find the 'sequence of events' in the SL10001 or that the jury's finding is against the weight of the evidence under the Court's claim construction as a matter of law. The Court therefore finds no basis to disturb the jury's findings of fact on this ground.

Lucas next argues that because the SL10001 exhibits a bipolar current and because the SL10001 uses a 'pulse transformer,' rather than a saturable core inductor, the SL10001 does not infringe claim 1 of the '073 patent. D.I. 394 at 23–26. First, although Lucas never questions whether substantial evidence exists for the jury to conclude that both of these elements, or their substantial equivalents, are found in the SL10001 exciter, substantial evidence supports the jury's finding that the function, way, and result of the SL10001 differs insubstantially from claim 1 of the '073 patent. Because the jury deliberated under the assumption that claim required an absolutely unipolar current, the jury necessarily found the SL10001 waveforms to be substantially the same as an absolutely unipolar waveform. Substantial evidence supports this finding. Inventor Frus and Lucas's Chief Engineer Godfrey testified that no circuit can achieve an absolute unipolar waveform, D.I. 406 at 1808; D.I. 402 at 2401–10; Frus testified that one skilled in the art would not classify the SL10001 waveform as bipolar simply because of small oscillations at the beginning of the

current pulse; *id.* at 2399–400; and Unison's expert Burton testified that his tests on the SL10001 showed a 'predominantly unipolar waveform,' D.I. 403 at 978, 980, 1062–63; *see also id.* at 1095, that the SL10001 energy delivery to the plug occurs in a unipolar pulse as required by the claim, *id.* at 1182–83, and that imperfections in a current waveform do not make that waveform bipolar, *id.* at 1183, 1231–40. This testimony indicates the differences between the SL10001's and the claimed invention's function and result are insubstantial, if any.

Further, substantial evidence supports the conclusion that the SL10001 achieves the unipolar current in the same way as the claimed invention. *See* D.I. 403 at 1094–95 (discussing use of a freewheeling diode in the SL10001 as a unidirectional device to achieve a unipolar current); D.I. 405 at 1337–38 (same). Additionally, the construction of this portion of the claim as a matter of law does nothing to the jury's verdict. In fact, contrary to Lucas's argument, it would have permitted the jury to find literal infringement of the SL10001 because Burton's tests of the SL10001 present substantial evidence that the oscillations occurring in the SL10001 fall within the bounds of ringing or noise at the initiation of the current pulse. *See* Unison Trial Exh. 410. The initial current oscillation varies in magnitude between tests, indicating that it is not an intended circuit design result. Also, in at least one test, Plot B, no change in current polarity is apparent. *See id.* A finding of no substantial difference between the accused device and '073 patent claim 1 easily falls within the Court's construction of the claim. Likewise, Unison presented substantial testimony that Lucas's 'pulse transformer' is at least the substantial equivalent of the inductor called out in the claim. *See* D.I. 402 at 2429–33; D.I. 409 at 1197; D.I. 400 at 2656.

Lucas objects that these evidentiary bases do not stem from particularized testimony and linking argument. This is not the case. No requirement for particularized testimony and linking argument exists as to elements which substantial evidence indicates are literally found within the accused device. Furthermore, Unison met this burden with respect to the unipolar waveform produced by a unidirectional device and Lucas's 'pulse transformer.' Unison presented substantial evidence to demonstrate the equivalence between the SL10001 waveform and what Unison believed, and the Court ultimately held, the claim required as a matter of law. The testimony Unison presented with regard to all elements of the claim are far removed from the facts facing the court of appeals in *Malta v. Schulmerich Carillons, Inc.,* and its precursors, where the patentee mentioned equivalence between the accused device and the invention only in passing. *See, e.g., Malta v. Schulmerich Carillons, Inc.,* 952 F.2d at 1327 (citing "Mr. Malta's offhand and conclusory statements ('buttons or the equivalent thereof' and 'They function like buttons')"). Here, Unison presented detailed testimony on the lack of substantial differences between Lucas' exciters and the claim requirements. Finally, Lucas's characterization of the testimony as directed toward literal infringement is irrelevant; all of Unison's testimony in this regard focused on showing that the SL10001 and its current waveform differed insubstantially, if at all, from the required waveform of the '073 patent.

The second portion of Lucas's argument contends the SL10001 cannot infringe by the doctrine of equivalents because pulse transformers existed in the prior art. This miscomprehends the basis on which prior art may limit application of the doctrine of equivalents. As a general matter, it is true that "limitations in a claim cannot be given a range of equivalents so wide as to cause the claim to encompass anything in the prior art." *Senmed, Inc. v. Richard–Allan Medical Indus.,* 888 F.2d 815, 821 (Fed.Cir.1989) (citation omitted). The rational is simply to limit the range of equivalent infringing devices to those devices the patentee could have literally claimed before the Patent and Trademark Office. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 684 (Fed.Cir.), *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). The Federal Circuit has thus suggested that application of the doctrine of equivalents becomes limited when a "hypothetical patent *claim,* sufficient in scope to literally cover the accused product[,] ... would have been obvious

in view of the prior art." *Id.* (emphasis added). It is not because a single, or even multiple, equivalent *portion* of a claim may be found in prior art that a claim reads on the prior art and becomes obvious because asserting that a single element of the accused device existed in the prior art does not ask whether the hypothetical claim, viewed as a whole, would have been obvious. *See infra* text at 1289–90 (setting out requirements to invalidate a patent for obviousness). Asserting that pulse transformers existed in the art prior to Unison's patents, for example, does not justify the legal conclusion that the '073 patent could not have specified a pulse transformer and still have been patentable.

Not only is the legal basis for Lucas's argument flawed; the factual basis is flawed as well. The Patent and Trademark Office has granted a claim in the '252 patent where the inductor claimed is one winding of a transformer. *See* '252 Patent claim 4. Also, although Lucas argues that the combination of United States Patent 2,896,123 to McNulty (Lucas Trial Exh. 346) and United States Patent 4,510,915 to Ishikawa (Lucas Trial Exh. 320) constitutes the equivalent hypothetical claim that covers Lucas's devices, Lucas forgets that it presented the jury with the question of whether McNulty and Ishikawa rendered the '073 patent obvious and that the jury answered in the negative. Substantial evidence exists to support that finding. *See infra* text at 1293.

 At this juncture, the Court notes that Lucas sets out similar arguments with respect to the permissible range of equivalents throughout its brief. *See, e.g.,* D.I. 394 at 26 (asserting noninfringement of '073 patent claim 2 because low tension igniter plugs and pulse transformers are found in the prior art); *id.* at 27 (asserting non-infringement of '073 patent claim 3 because a dual spark rate and a pulse transformer are "found in the prior art"); *id.* at 37 (asserting non-infringement of '252 patent claim 1 because pulse transformers existed in the prior art); *id.* at 38–39 (matching elements of the Lucas devices to individual pieces of prior art); *id.* at 43 (asserting noninfringement of '252 patent claim 3 because inductors existed in the prior art); *id.* (asserting noninfringement of '252 patent claim 4 because transformers and windings of transformers are used in prior art); *id.* at 43–44 (asserting noninfringement of '252 patent claim 5 because unidirectional devices are found in prior art references); *id.* at 44 (asserting noninfringement of '252 patent claim 7 because the sensor feature is found in prior art); *id.* (asserting noninfringement of '252 patent claim 8 because DC-to-DC convertors are found in prior art references). A patent claim that includes a structure, means, or function that the patentee did not invent from first principles, i.e., a patent claim that includes a structure, means, or function previously known to the world, does not render that claim invalid or make that claim read in the prior art. To conclude otherwise would invalidate all but the most innovative pioneer patents. And if Lucas's reading of *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.* is correct, not only should Lucas's devices not infringe, but Unison's patents should be prima facie invalid because they contain basic electrical components, including a DC-to-DC convertor, a unidirectional device, and an inductor, previously known in the art. Lucas's *Wilson* arguments miscomprehend the interrelationship of the doctrine of equivalents and the prior art. The Court therefore finds Lucas's *Wilson* arguments without merit, as made with respect to both the '073 and '252 patents.

Lucas next argues that the SL10001 and the SL20011 do not infringe claim 1 of the '252 patent under the doctrine of equivalents. First, Lucas argues that its devices produce a waveform that most closely resembles Figure 3a and 4 (curves B and C) of the '252 patent. This argument, even if not essentially an interpretation of the evidence within the province of the jury, is foreclosed by the proper construction of the '252 claim language as a matter of law. Second, Lucas argues that its devices do not infringe because they exhibit sharp transition between slow and fast rates of current charge. Again, Lucas seeks a finding of fact outside the province of the Court and fails to illustrate how, if at all, Unison's infringement proof failed to meet the evidentiary requirements for the jury to find the Lucas devices

'waveshape.' Moreover, substantial evidence exists to show the Lucas devices do waveshape. *See, e.g.,* D.I. 409 at 1084, 1158–65, 1168–70; D.I. 400 at 2652–53; D.I. 402 at 2429–33.

Lucas then argues that the jury could not find, as a matter of law, that its devices contain the '252 patent claim's express limitation that the network be interposed between a series connected solid state switch and igniter plug. D.I. 394 at 36. As the Court held when construing this claim language, the positional reference 'interposed between' requires the solid state switch, network, and igniter plug to appear in an infringing device in that specific order. *See Lucas Aerospace, Ltd. v. Unison Indus., L.P.,* 890 F.Supp. at 342. Both Lucas and Unison agree that Lucas's exciters implement these components in the order switch, plug, network.

Unison presented substantial evidence at trial with which the jury could find that the differences between Lucas's devices and the claimed invention are insubstantial. Both Lucas's and Unison's experts testified that Lucas's component order switch, plug, network did not effect the performance of Lucas's exciters. *See* D.I. 409 at 1185–86; D.I. 405 at 1310–11; D.I. 402 at 2153–55. In other words, Lucas's exciters perform the same function as that called out by the claim. Unison's expert also testified that, so long as the switch, plug, and network were connected in series, the same current would pass through the components, regardless of their order, and the components would "still operate[ ] in the same way." D.I. 405 at 1310; *see also id.* at 1315–16 (MR. NEESEMAN [Counsel for Lucas]: "Now, your thesis, I think, is that it doesn't matter what direction. It all amounts to the same thing under this patent; isn't that right?" MR. BURTON [Unison's expert]: "Well, first of all, it's not my thesis. It's common electrical engineering practice when one has several components in a series circuit, they can be rearranged in any order. The circuit still flows through all of them and it doesn't make any difference what order they're in."). This same testimony provides substantial evidence on which to conclude the component order switch, plug,

network produces the same result as the claimed invention.

This testimony provides an overwhelming basis for the Court to conclude that substantial evidence underlies the jury's implicit finding of no substantial difference between the claimed invention and the accused devices. If that be so, Lucas argues that to allow the jury's finding of infringement under the doctrine of equivalents to stand, the Court will have allowed the jury to read an express limitation out of the claim, specifically that the network appear *between* the switch and the plug. Application of the doctrine of equivalents does not require the accused device to literally include every limitation found in the claim. Rather, as previously stated, infringement under the doctrine of equivalents requires every limitation, *or its substantial equivalent,* to appear in the accused device. "The doctrine of equivalents, by definition, involves going beyond any permissible interpretation of the claim language; i.e., it involves determining whether the accused product is 'equivalent' to what is described by the claim language." *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d at 684.

The evidence in this case does not exhibit the factors that led to a finding of noninfringement in many of the leading cases from the court of appeals. For example, in *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935–36 (Fed.Cir.1987) (in banc), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988), *and cert. denied,* 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988), the court of appeals affirmed a district court judgment holding the patentee failed to prove infringement because, while the accused device performed substantially the same function and achieved substantially the same result as the claimed invention, the accused device performed that function and reached that result in a manner substantially different than that called for in the patent claims. The accused device sorted fruit using a computer that tracked weight and color, while the patent claims sorted fruit using a hard-wired system that continuously indicated the fruit's position. *Id.* at 935–36. In contrast, in this case, substantial evidence

supports the conclusion that reordering the switch, network, and plug in Lucas's device does not change the electrical manner in which the switch, network, and plug cooperate to perform the waveshaping function an achieve the spark result.

Similarly, this is not a case where the accused device achieves the same result as the claimed invention by eliminating a meaningful structure in the invention. In *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394 (Fed.Cir.1994), for example, an open-ended claim required, among other elements, a seat panel, a back panel, and a self-supporting and free-standing stable rigid frame. *Id.* at 396. The accused device did not have a separate stable rigid frame but rather had a stable rigid frame "assembled from the seat and back panels" that was not merely a known alternative substitute to the stable rigid frame, and the court of appeals held that no infringement was possible unless the court failed to give effect to the requirement of a separate stable rigid form. *Id.* at 400. Again, the facts in this case differ significantly. The components required by the claim appear in the accused device, and Unison presented substantial evidence supporting a finding that Lucas's switch, plug, and network circuit design differed insubstantially from the claimed invention.

Finally, *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed. Cir.1989), provides strong guidance on application of the doctrine of equivalents in this case. In *Corning Glass*, the invention related to optical fibers featuring a positive dopant in the fiber core. The dopant made the core's index of refraction greater than that of the cladding and allowed the fiber to transmit light. *Id.* at 1254–55. The accused device sustained a negative dopant in the cladding but no dopant in the core. *Id.* at 1258. The court of appeals rejected the argument that the accused device lacked a limitation, the positive core dopant, that would prevent infringement under the doctrine of equivalents, and the court found no error in the finding of infringement because an equivalent to the positive core dopant existed in the negative cladding dopant. *Id.* at 1261. According to the court of appeals, "[a]n equivalent must be found for every limitation of the claim somewhere in an accused device, but not necessarily in a corresponding component, although that is generally the case." *Id.* at 1259.

Substantial evidence exists to support a finding that the component order switch-network-plug of the invention is indistinguishable electrically from the component order in the Lucas devices. The testimony went so far as to suggest that even an electrical designer with less than ordinary skill in the art would have found the switch-plug-network and switch-network-plug component orders to be electrically interchangeable. The paucity of differences between Lucas's devices and the claimed invention falls at the heart of the rationale for the doctrine of equivalents—to avoid placing "the inventor at the mercy of verbalism and ... subordinating substance to form," *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

Lucas makes one feeble attempt to attach a function to the order switch, network, plug. Although Lucas never presented this theory to the jury, Lucas now claims the network must fall between the switch and plug to waveshape the current flowing from the capacitor. This contention is based on bits and pieces of arguably relevant testimony that the jury could justifiably disregard. Nor does this argument suggest that a finding of infringement is against the clear weight of the evidence. No witness attached importance to the placement of the network relative to the capacitor; contrary to Lucas's brief, one must take Lucas expert Schlect's testimony far out of context to argue that he meant placement of the network is meaningful to anything other than a literal interpretation of the '252 patent. *See, e.g.,* D.I. 401 at 2021. Lucas's citation to the element of the claim before the 'interposed between' element also adds nothing. It simply describes how the switch operates; it does not suggest that current must flow through the network prior to reaching the plug so as to waveshape. Most importantly, all testimony indicated that the ordering of the switch, network, and plug made no difference in the electrical function and output of the circuit

and that the network will shape the capacitor's energy discharge regardless of the series arrangement of the network, switch, and plug. This testimony casts serious doubt on Lucas's post-trial discussion of how the circuit operates. Substantial evidence supports the verdict, and the verdict is not against the clear weight of the evidence.

Finally, the manner Lucas has framed its discussions of whether the Lucas devices infringe under the doctrine of equivalents raises the question of whether the jury's verdict is against the clear weight of the evidence and warrants a new trial. Both Lucas and Unison presented substantial evidence to support their version of the case at trial. Lucas's post-trial factual presentation of this evidence amply illustrates that had Unison brought a motion for summary judgment, genuine issues of material fact would have presented entry of judgment. Lucas's plausible factual presentation, however, does not illustrate that the jury's findings in favor of Unison are against the weight of the evidence. The jury evaluated Lucas's evidentiary presentation and for the most part rejected it. Simply arguing that evidence would have supported the opposite conclusion does not compel a finding in favor of Lucas or a new trial. After evaluating the entire testimonial and evidentiary record, the Court finds that the jury's verdict is *not* against the weight of the evidence, that no basis exists to grant Lucas's motion for a new trial on the infringement issues, and that nothing in the record compels the Court to discard the jury's findings of fact and enter judgment on the infringement issues in favor of Lucas.

### C. Contributory Infringement

 Lucas next argues that it is entitled to judgment as a matter of law that its sales of the SL10001 exciter to Pratt & Whitney Canada do not contributorily infringe either the '073 or the '252 patents. The jury found that the SL10001 contributorily infringed both patents under the doctrine of equiva-

lents. *See* D.I. 373. Unison responds that substantial evidence exists to support the jury's verdict as to contributory infringement.

At trial, Unison carried the burden to prove by a preponderance of the evidence that Lucas sold a component of the patented invention that is not a "staple article" or "commodity of commerce suitable for substantial infringing use," with knowledge that component would be used to infringe the patent. 35 U.S.C. § 271(c).[7] Lucas argues that Unison failed to prove that Lucas knew its customer, Pratt & Whitney Canada, would install the SL10001 on aircraft engines used or sold in the United States. Without proof of that knowledge, Lucas argues that no substantial evidence exists to show Lucas knew Pratt & Whitney Canada would use the SL10001 to infringe Unison's patents. *See* D.I. 394 at 51–53. Lucas also contends that Unison failed to present evidence to demonstrate the Lucas exciters have no substantial noninfringing use. *Id.* at 53–54. Lastly, Lucas argues that the jury's finding of contributory infringement with respect to Lucas's sales of the SL10001 to Pratt & Whitney Canada impermissibly gives extraterritorial effect to the patent laws of the United States. *Id.* at 54–55. The Court finds no merit in these contentions.

 First, the Court finds substantial evidence to support the jury's implicit factual finding that Lucas knew its sales of the SL10001 would result in infringement of Unison's patents. Proof of contributory infringement may be based on circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed.Cir.1986), *cert. denied* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). Dan Ryan, Unison's Vice President of Marketing, testified that Lucas supplies Pratt & Whitney Canada with 50 percent of its ignition exciter requirements for the PW100 engine. Ryan also testified that 55 to 60 percent of Pratt's

---

**7.** 35 U.S.C. § 271(c) provides in full:

Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

PW100 engine output makes its way into the United States. Furthermore, Stuart Easthope, General Manager of the Lucas division that manufactures the exciters at issue in this suit, testified on cross-examination that he knew Lucas exciters were installed on Pratt & Whitney Canada engines sold in the United States.[8] This constitutes substantial evidence for the jury to conclude Lucas knew a significant portion of the SL10001 exciters supplied to Pratt & Whitney Canada were used or sold within the United States.[9] The inference is strengthened even more because all testimony indicated Pratt & Whitney has sold roughly 1700 PW100 engines equipped with the SL10001, as well as Ryan's testimony that at least one SL10001 had appeared on an engine in Arkansas.

Second, Lucas argues that "the record requires a finding that the SL10001 exciter model is 'suitable for substantial noninfringing use'" because a substantial number of SL10001 equipped PW100 engines are not sold or used in the United States. D.I. 394 at 54. In other words, Lucas is attempting to evade the scope of § 271(c) by setting up the following syllogism: Exciters never made, use, or sold in the United States are noninfringing; a substantial number of Lucas exciters are never made, used, or sold in the United States; therefore, all Lucas exciters, whether used or sold in the United States or not, have a substantial noninfringing use. This argument begs the Court to fall into the logical fallacy of the undistributed middle. As a matter of logic, the fact the some SL10001 exciters are noninfringing because they are made, used, and sold outside the United States does not mean that all SL10001 exciters are noninfringing no mat-

ter where they are made, used, or sold, any more than the fact that because fish cannot fly and penguins cannot fly, penguins therefore must be fish.

 More importantly, this argument fails as a matter of law. Section 271(c) is directed towards the sale of a portion of the patented invention to the direct infringer. As such, the phrase "substantial noninfringing use" relates not to whether the portion of the invention supplied by the contributory infringer may be used or sold *outside* the United States, but rather toward whether that component has a use other than to be combined with other items that together fall within the metes and bounds of the claims of the patent. In other words, 'substantial noninfringing use' modifies the phrase 'commodity of commerce' in the physical sense, not in the metaphysical sense of whether an item meets all the temporal and locational requirements to be liable as infringing under § 271(a). *See, e.g.,* 35 U.S.C. § 271(c) (qualifying the noun *components* of patented inventions with staple *articles* and *commodities* of commerce suitable for substantive noninfringing use). Additionally, the Court notes that substantial evidence exists for the jury to conclude the SL10001 is not a staple article or a commodity of commerce suitable for 'substantial noninfringing use,' as that phrase is interpreted properly as a matter of law.

Lastly, a finding of contributory infringement with respect to the SL10001 does not unreasonably extend the territorial scope of Unison's products. Substantial evidence supports the conclusion that Lucas sells SL10001 exciters that are used or sold within

---

**8.** *See* D.I. 404 at 290–91 (Mr. Sheppard [Counsel for Unison]: "Can you identify some of the customers to whom Lucas Aerospace supplies solid state ignition systems for turbine engines?" Mr. Easthope: "We have supplied solid state ignition engines [sic] for turbine engines to Rolls Royce, Pratt & Whitney Canada, Garrett." ... Mr. Sheppard: "Do you know whether the gas turbine engines that are manufactured by Pratt & Whitney Canada are installed on airplanes for sale in the United States?" Mr. Easthope: "I would believe that since Pratt & Whitney Canada installs engines on a number of aircraft and that those aircraft are freely available worldwide, *the answer to the question must be yes*.") (emphasis added). The fact that Unison elicited this testi-

mony during Lucas's case-in-chief on the Labo patent is of no moment. *See Verdegaal Bros., Inc. v. Union Oil Co.,* 814 F.2d 628, 631 (Fed. Cir.) (stating that a court must "consider all of the evidence" presented at trial when evaluating a motion for judgment as a matter of law), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987).

**9.** This indeed appears to be the approach taken by the jury, as evidenced by its award of damages to Unison in an amount equivalent to roughly 50 percent of Lucas's sales of the SL10001 to Pratt & Whitney Canada.

the United States. On these bases, the Court has no trouble concluding that § 271(c) thus provides ample statutory authority to hold Lucas liable as an infringer of the '073 patent for its sales of the SL10001 to Pratt & Whitney Canada.

## IV. JURY FINDINGS—VALIDITY

A. *Invalidity of '073 Patent Claims 1 & 2*

 Unison's renewed Rule 50(b) motion for judgment as a matter of law seeks to overturn the jury's verdict with respect to the invalidity of claims 1 and 2 of the '073 patent. *See* D.I. 395. The jury found that the combination of U.S. Patent 3,716,758 to Palazzetti ("Palazzetti"), Lucas Trial Exh. 126, and Aerospace Information Report 784A, published by the Society of Automotive Engineers ("SAE" report or "AIR"), Lucas Trial Exh. 419, rendered claims 1 and 2 of the '073 patent invalid as obvious pursuant to 35 U.S.C. § 103. *See* D.I. 373. Unison argues that no substantial evidence exists to suggest the combination of these references in a manner that results in the claimed invention, D.I. 396 at 12–18, and that the combination of these two references does not result in the claimed invention, *id.* at 18–20. Lucas rejoins that substantial evidence supports the jury's verdict on both of these grounds. D.I. 410 at 14–24. Preliminarily, however, Lucas argues that Rule 50(b) prohibits Unison's motion because Unison failed to move for judgment as a matter of law on Lucas's defense of obviousness at the close of Lucas's case-in-chief. *See id.* at 12–14.

As noted previously, Rule 50(b) permits a party to renew its motion for judgment as a matter of law when the court has denied or for any reason not granted that party's motion before submitting the action to the jury. Lucas attacks the timeliness of Unison's Rule 50(b) motion by contending Unison's trial motion only sought judgment as a matter of law on the ground that Lucas failed to present testimony with respect to the level of ordinary skill in the art and unspecified "other grounds" relating to obviousness. Lucas thus concludes that Unison's present motion is barred because Unison failed to raise its claims of lack of substantial evidence during trial.

 To determine the procedural propriety of a Rule 50(b) motion, the district courts must apply the law of their regional circuits. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 681 n. 4 (Fed.Cir.), *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). The moving party must timely move for judgment as a matter of law and specify the grounds for that motion before the close of evidence at trial. *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993). At a minimum, the moving party must at least implicitly raise the issues in its Rule 50(b) motion during the trial. *Id.* In part, the movant must have raised the grounds for its judgment as a matter of law at trial so that the non-moving party may correct any deficiencies in the proof of its case. *Id.* Under these standards, Unison's motion is properly before the Court.

Lucas never brought the proposed combination of the Palazzetti and AIR references to the Court's, the jury's, or Unison's attention until March 28, the last day of trial. Lucas's "Statement of Facts Remaining to be Litigated" contained in the stipulated pretrial order the Court signed before trial does not list Palazzetti and AIR as a combination that would render the '073 patent invalid as obvious. *See* D.I. 251, Exh. B at ¶ 37 (listing prior art references that could be combined with Palazzetti to render the '073 patent invalid as obvious); *id.* at ¶¶ 28, 36, 38, 39 (listing prior art references that could be combined with the SAE report to render the '073 patent invalid as obvious). At trial, Lucas presented no evidence that suggested the combination of the SAE report and Palazzetti or even discussed the SAE report and Palazzetti in the same context. Furthermore, Lucas had not revealed this proposed combination of prior art references at the time Unison made its final motion of judgment as a matter of law at the close of all the evidence on March 27. Only at the final charge conference on March 28, the day *after* the parties made their motions for judgment as a matter of law, did Lucas present jury interrogatories that included a list of the possible combinations of prior art references,

as requested by the Court the previous day. *See* D.I. 400 at 2701–02 (the court instructing Lucas to tabulate the combinations of prior art reference for incorporation into the jury instructions so that the jury need not cast about through the references introduced at trial to decide the obviousness issue). Among other combinations listed by Lucas was AIR/Palazzetti. Stated differently, Lucas never gave Unison or the Court notice that it planned to assert this combination of prior art references to the jury. Without an inkling that Lucas would rely on the AIR/Palazzetti combination, Unison could not contest the factual basis for presenting this combination to the jury. Under this circumstance, Unison should not and will not be barred from pursuing its motion for judgment as a matter of law.

The factual scenario recounted above is quite unlike *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802 (3d Cir.1984), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986), cited by Lucas. In *Bonjorno*, the defendant based its post-trial motion on a legal theory not only never raised during trial, *see id.* at 814, but also inconsistent with the jury instructions the defendant agreed to at the close of evidence, *see id.* at 815 ("The district court also specifically asked counsel for [defendant] Kaiser whether he objected to plaintiffs' legal basis for seeking damages for diminution of going concern value, and *Kaiser's counsel raised no objection to the submission of the issue to the jury.*") (emphasis added). Unison's motion for judgment as a matter of law does not present this scenario because Unison had no fair opportunity to move for judgment as a matter of law on the AIR/Palazzetti combina-

tion. Accordingly, the Court finds that Unison's motion is properly before the Court.

■ To determine whether a patent is invalid because it is obvious as defined by 35 U.S.C. § 103 is a question of law that requires factual inquiries into "(1) the scope and content of the prior art; (2) the differences between the prior art devices and the claimed invention; (3) the level of ordinary skill in the art; and (4) objective considerations," if any, of nonobviousness. *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prod., Inc.*, 21 F.3d 1068, 1071 (Fed.Cir.1994); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 291 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). "[I]t is the invention as a whole that must be considered in obviousness determinations. The invention as a whole embraces the structure, its properties, and the problem it solves." *In re Wright*, 848 F.2d 1216, 1219 (Fed.Cir.1988). "Thus the question is whether what the inventor did would have been obvious to one of ordinary skill in the art attempting to solve the problem upon which the inventor was working." *Id.* The party challenging the patent must demonstrate its invalidity with clear and convincing evidence.[10] The Court reviews the findings of fact underlying the jury's verdict for substantial evidence and examines the legal conclusion of the jury *de novo* to determine whether it is correct in light of the presumed jury's fact findings. *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 541 (Fed.Cir. 1990), *cert. denied*, 500 U.S. 918, 111 S.Ct. 2017, 114 L.Ed.2d 103 (1991).

---

10. This burden was not lessened by the fact that Unison did not cite the AIR reference to the Patent Office, *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Furthermore, the only testimony at trial indicated that AIR reference is no more pertinent than any other prior art. *See, e.g.*, D.I. 402 at 2190–91 (MR. CONKLIN [Counsel for Unison]: "How about the AIR report? Did you compare that to the cited references to see if it was any more relevant than what the examiner considered?" ... MR. SCHLECT [Lucas's expert]: "The AIR report ... is a document that sort of gives a glossary of what all the terms mean, goes

through these various different types of circuitry, exciter circuitry there and so on. I don't know that it has anything in it that's necessarily more relevant than the art that was cited."); AIR (Lucas Trial Exh. 419) at ¶ 1.2 ("PURPOSE: To present a definitive collection of standard references, nomenclature, and descriptive terminology sufficient to provide a basis for design approach in specification of gas turbine ignition systems."). Reliance on the AIR reference therefore does not assist Lucas in meeting its burden any more than other pertinent prior art, *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed.Cir. 1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

Neither Unison nor Lucas disputes that both the SAE report and the Palazzetti patent are relevant prior art. Likewise, neither party disputes that one of ordinary skill would possess at least two years of technical engineering training at the college level plus another year or two working on electronics matters in the design of circuits for ignition systems, as the Court instructed the jury at trial. *See* D.I. 407 at 2809–10. The stated purpose of the AIR document is also straightforward: "To provide the designer of gas turbine engines with a working knowledge of the interrelation between engine performance objectives and the part played by ignition in meeting the objectives," AIR (Lucas Trial Exh. 419) at ¶ 1.1, and "[t]o present a definitive collection of standard references, nomenclature, and descriptive terminology sufficient to provide a basis for design approach in specification of gas turbine ignition systems," *id.* at ¶ 1.2. Palazzetti, in contrast, had identified a problem that previously made use of solid state switches in ignition systems infeasible and solved that problem by patenting the use of an inductive device with a high initial impedance (i.e., a saturable core inductor) "[t]o limit the current through the thyristor [a type of solid state switch] during the initial states of firing[,] . . . thereby reducing wear in the thyristor." Palazzetti (Lucas Trial Exh. 126) Abstract.

"When prior art references require selective combination by the . . . [factfinder] to render obvious a subsequent invention, there must be some reason for the combination other than the hindsight gleaned from the invention itself." *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1051 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988) (quotation omitted). That reason may include a suggestion found in the prior art to combine the references. *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prod., Inc.*, 21 F.3d at 1072; *see also In re Geiger*, 815 F.2d 686, 688 (Fed.Cir. 1987) (holding the obviousness of a combination must be established by some "teaching, suggestion or incentive supporting the combination").

The Court has examined all references to AIR and Palazzetti in the transcript, either singly or together, and has found no testimony suggesting to the jury that one skilled in the art would have found it obvious to combine the AIR and Palazzetti so as to create the claimed invention. Not only is there no testimony suggesting the combination of AIR and Palazzetti, there is no testimony suggesting the addition of a unidirectional device to Palazzetti, the principle that Lucas asserts AIR reveals as prior art. The only thing close to a suggestion to combine the art disclosed in the two references, as Lucas is quick to point out after the trial, is the AIR reference's discussion of unidirectional devices. This suggestion does not constitute substantial evidence on which the jury could base its finding of obviousness.

The evidence Lucas asserts suggests a combination of Palazzetti and AIR appears in a discussion of unidirectional devices that follows an outline of what SAE felt were the five conventional standard ignition system standards:

A unidirectional capacitance discharge circuit can produce discharge efficiencies of 20% to 60% rather than the 10% to 30% mentioned in 7.1.1. The unidirectional discharge circuit provides a non-oscillatory discharge current. The conventional oscillatory discharge circuit has become a basic ignition system standard and improving its efficiency seems to be reaching a point of diminishing return. The unidirectional discharge circuit is similar to the conventional circuit except for the inclusion of a "free wheeling" diode connected from the outside of the discharge gap to ground. It is suitable for use either in low tension or high tension circuit [sic].

AIR (Lucas Trial Exhibit 419), ¶ 4.7. From this language, Lucas argues "[w]hat could be more logical than to bring to AIR both the solid state switch of Palazzetti and Palazzetti's concept of using a saturable core to protect it." D.I. 410 at 20. That is not the question. The question is whether on the basis of this passage the jury could find by clear and convincing evidence that AIR teaches one skilled in the art to implement one of AIR's conventional discharge circuits with a unidirectional device, as suggested in paragraph 4.7, and replace the discharge gap

illustrated in AIR's conventional discharge circuits with the solid state switch and saturable core inductor of Palazzetti. The Court holds that ¶ 4.7 does not amount to substantial evidence, much less clear and convincing evidence, teaching or suggesting the combination of Palazzetti and AIR and that no reasonable jury could combine those references on the basis of all the evidence presented at trial.

The fact that, in hindsight, Lucas can make an argument in its brief that a unidirectional device placed in parallel with the secondary winding of the transformer depicted in Figure 1 of Palazzetti would result in the invention disclosed in claim 1 of the '073 patent is irrelevant. AIR suggests the combination of a unidirectional device with either a low tension or high tension conventional oscillatory discharge circuit. AIR itself illustrates what it considers to be conventional discharge circuits; these circuits uniformly use a spark gap, not a solid state switch, to trigger the firing of the plug. *See* AIR (Lucas Trial Exh. 419) at ¶¶ 4.1–4.6. Nowhere does the SAE report teach the utility of replacing the spark gap with a solid state switch or even mention the use of a solid state switch in an ignition circuit. While the jury could have found, as did the patent examiner, that one skilled in the art would have known Palazzetti provides an alternative means to implement the function of a spark gap, that finding alone does not amount to either substantial evidence or clear and convincing evidence on which to conclude one skilled in the art would have simply plugged the Palazzetti invention into a conventional spark gap circuit. Conversely, nothing in the AIR report suggests that simply adding the known in the art unidirectional device to a Palazzetti-like circuit would result in an igniter circuit that meets the basic requirements for turbine engine service. While Lucas can argue in hindsight that is obvious to do so, the AIR report does not even remotely make that suggestion.

And therein lies the problem in Lucas's proof. Lucas failed to present any evidence, including the AIR report, that suggests one skilled in the art would substitute Palazzetti's solid state switch/saturable core inductor concept for the spark gap exclusively used in what AIR describes as illustrative of conventional discharge circuitry. Instead, in many ways the AIR report teaches away from making that substitution. For example, when discussing the stored versus spark energy of an igniter system, the report cautions "how a relatively minor change in inductance present in the discharge portion of the ignition circuit can significantly influence the spark discharge characteristics." AIR (Lucas Trial Exh. 419) at ¶ 7.1.1. This counsels one skilled in the art to be chary of importing any technology into a turbine engine ignition system that would bring a change in the inductor. It was the breakthrough of the '073 patent that first revealed a saturable core inductor not only protects the switch but also provides highly beneficial properties to durability of the plug and to the spark itself. *See* '073 Patent (noting the current waveform produced by a saturable core inductor "provides an initially hotter and longer lasting spark which does not harm the ignitor plug of the system or shorten its life expectancy.") (Abstract).

The SAE report also teaches away from using a saturable core inductor to benefit the plug. The report suggests that "[t]he [physical] design of the spark igniter tip has as much or greater effect on the energy delivered by the spark, relative to the stored energy, as any other feature in the discharge path," and goes on to discuss how the plug electrode geometry, area, spacing, and material will impact the energy delivery during the spark event. AIR (Lucas Trial Exh. 419) at ¶ 7.1.1.2. This discussion, like that of the unidirectional device itself, all points toward enhancing *plug design* to maximize the initial energy delivered at the plug so as to ensure combustion, not to create an initial low current as is done with a saturable core inductor to facilitate combustion. *See* '073 Patent, col. 4 at ln. 53–63 ("Applicant believes the low initial current provided by the invention ... allows the plug to ionize the air over the semiconductor material as is necessary for proper operation of the plug without unnecessarily stressing the plug by forcing high current through the semiconductor material prior to creation of a spark.")

In the end, Lucas's suggestion to focus on the AIR reference's recommendation to utilize a unidirectional device in what it terms a conventional discharge circuit is a red herring because this recommendation does nothing to suggest the obviousness of importing the invention of Palazzetti in place of a spark gap. Palazzetti provides the means to utilize a solid state switch; Palazzetti also does not provide the rationale to replace a discharge gap with a solid state switch. The Court thus finds no evidence on which the jury could have based its necessary finding that it would have been obvious to one skilled in the art to implant the invention of Palazzetti in place of discharge gap used in the SAE report. Instead, the report counsels against making such changes. For these reasons, the Court will grant Unison's motion for judgment as a matter of law.

### B. Jury Findings of Non–Obviousness

Lucas devotes substantial portions of its brief to the proposition that the evidence compels a finding of invalidity and that the jury's verdict is against the great weight of the evidence. This contention is tempered by the jury's findings that Lucas failed to carry its burden to prove by clear and convincing evidence the invalidity of claims 3 and 17 of the '073 patent, claims 1, 3, 4, 5, 7, and 8 of the '252 patent, and claim 8 of the '437 patent. To support its assertions, Lucas compares the patent claims to the prior art references in search of common elements that, according to Lucas, the jury either "must have missed the significance of," D.I. 394 at 27, or, by implication, simply did not understand. See generally id. at 27–28, 39–43, 43–44, 47–49.

■ The initial question, as always, is whether substantial evidence exists to support the jury's finding that Lucas did not demonstrate, by clear and convincing evidence, that the patents were invalid. Stated conversely, in the language of Rule 50(a), did any legally sufficient evidentiary bases exist for a reasonable jury to find Lucas did not carry its burden of proof? See, e.g., Perkin–Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed.Cir.) ("Where, as here, there is a verdict of validity, the question is not whether the patentee had introduced sufficiently substantial evidence to support the verdict, but whether the challenger's evidence so met the burden imposed by 35 U.S.C. § 282 ('[t]he burden of establishing invalidity of a patent or any claim shall rest on the party asserting such invalidity') that reasonable jurors could not have concluded that the challenger failed to overcome that burden.") (citation omitted) (brackets in original), cert. denied, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); id. at 895 (noting the district court "answer[ed] the appropriate question: can the jury's presumed findings support conclusion of nonobviousness encompassed in the jury's verdict of validity?") (footnote omitted). The Court finds more than substantial evidence to support the jury's findings. Lucas had carried the burden of proof at trial to show by clear and convincing evidence that some reason, suggestion or motivation found in the prior art directed a person of ordinary skill in the art to combine prior art references in a manner that would make the invention obvious as a whole. See supra text at 1289–90. The jury's verdict demonstrates that it did not accept the elemental analysis of the prior art references recited in Lucas's brief as sufficient to satisfy Lucas's burden of proof.

Lucas argues that any suggestion it did not carry its burden of proof with respect to whether one skilled in the art would have combined the prior art references must fail because "the prior art references as a whole teach all of the elements of the claimed invention." D.I. 412 at 14. Nothing required the jury to accept Lucas's interpretation of whether one skilled in the art would combine the given references or Lucas's opinion as to whether the prior art elements as a whole teach Unison's inventions. Simply asserting, for example, "[t]he circuitry scheme of the Lucas Aerospace devices is precisely what is reflected in [the] references," D.I. 394 at 38, and then mixing and matching the components of those references does not mandate a conclusion that no legally sufficient basis exists for a reasonable jury to conclude that Lucas did not carry its burden of proof. Lucas raises no meritorious basis on which to hold in its favor, and the Court will not substitute its judgment for a jury's findings

of fact. Moreover, the Court detects no error in the jury's validity findings "so grievous as to have rendered the trial unfair" as to warrant grant of a new trial. *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 427 (Fed.Cir. 1986).

Moreover, substantial evidence exists to support the jury's findings that Lucas did not carry its burden of proof to show the patents invalid. A non-exhaustive summary of this evidence includes the following: [11] Testimony by Lucas's expert Schlect that under what he believed to be the proper method to interpret the word 'means' in the '437 patent, the Di Nunzio reference, European Patent 0,277,468 (Lucas Trial Exh. 149), did *not* render the '437 patent invalid, D.I. 402 at 2185–87; testimony by Unison expert Burton that the Ishikawa reference teaches away from the '073 and '252 patents because Ishikawa perceives problems with saturable core inductors and attempts to solve them, D.I. 405 at 1341–42; testimony by Burton that McNulty fails to disclose Unison's invention, D.I. 400 at 2634–35; testimony by inventor Frus that McNulty does not contain most elements of the '073 and '252 patents, including a solid state switch and a unidirectional device, *id.* at 2539–40; testimony by Frus that the Menard reference, U.S. Patent 4,414,804 (Lucas Trial Exh. 83), does not discuss the dual spark rate of claim 3 of the '073 patent, *id.* at 2501–03; testimony by Frus that Randall, U.K. Patent Specification No. 962,417 (Lucas Trial Ex. 82), does not disclose or suggest waveshaping to effectively ignite the fuel, D.I. 403 at 866, *see generally id.* at 871–74; and testimony by Frus that the Palazzetti reference does not teach waveshaping the current to the plug, D.I. 400 at 2503–04. Furthermore, the Court has examined these references and the SAE report 'as a whole' and finds a substantial basis for the jury to find Lucas did not prove by clear and convincing evidence that any of these references should be combined. Overall, the Court finds no ground to disturb the jury's

findings of validity or to grant Lucas a new trial on these issues.

### C. *Inventorship*

■ At trial, Lucas argued that the '073 patent and '252 patents were invalid for failure to identify Floyd Minks as an inventor. Unison had hired Minks to develop portions of the patented invention, but after Minks failed to implement the desired circuitry and began to request increasing payments from Unison, the Unison–Minks relationship turned sour. Unison then hired John Frus, who developed what became the patented inventions. The Court submitted the underlying factual questions for the equitable issue of inventorship to the jury: Did Lucas prove by clear and convincing evidence that Floyd Minks was an inventor or joint inventor of either the '073 or '252 patents, and, if yes, did Lucas show by clear and convincing evidence that Unison failed to name Floyd Minks as an inventor or joint inventor with deceptive intent? *See* D.I. 373 at 16.

The jury answered the first question in the negative with respect to both patents. Lucas now argues this conclusion is "against the weight of the evidence" because "[t]he evidence at trial clearly established that Floyd Minks is the inventor or a co-inventor on the '073 and '252 patents." D.I. 394 at 55.[12] The question of what Unison, Lucas, or the Court believes the evidence 'clearly established' at trial is not the question, however. The standard of review asks whether "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir.1991). It does not.

First, Frederick Sontag, Unison's President, presented substantial evidence that he conceived of and began an effort to develop the concepts that resulted in the '073

**11.** The evidence is arranged by prior art reference, rather than patent, because Lucas relies on a small number of references for its invalidity arguments.

**12.** Lucas does not question whether substantial evidence supports the jury's finding that Lucas

did not prove by clear and convincing evidence that Floyd Minks is an inventor of co-inventor of the '073 and '252 patents. As detailed in the text, substantial evidence supports the jury's finding.

and '252 patents as early as December 4, 1984. *See* D.I. 408 at 396–401, 407–10; Unison Trial Exh. 430. From this evidence, a reasonable jury could conclude that Sontag conceived of the invention 16 months earlier than Mr. Minks, who makes reference to concepts found in the invention beginning in February, 1986. *See* D.I. 402 at 2258–59. Furthermore, inventor Frus testified both in Unison's case-in-chief and in rebuttal that Minks's work on the circuit would not operate, that Minks refused to provide information on his circuitry, and that Frus had to design the circuitry from scratch. D.I. 399 at 707–14; D.I. 400 at 2505–11. Additionally, Frus testified as to the differences between the patented inventions and the circuits designed by Minks. *Id.* at 2505–07. From this testimony, substantial evidence exists to support the jury's finding of fact, and the Court rejects Lucas's suggestion that the Court substitute its judgment on witness credibility and weight of the evidence for that of the jury. The jury's findings were not against the weight of the evidence such that the jury's verdict works either a miscarriage of justice or creates an error in the trial so grievous as to render the verdict as to inventorship unfair.

## D. *Equitable Estoppel*

Lucas next argues that the Court erred in granting Unison's motion for judgment as a matter of law on the issue of equitable estoppel. The defense of equitable estoppel includes a factual determination as to misleading conduct by the patentee that would justify belief in the infringer that the patent will not be enforced against the infringer, the accused infringer's reliance on the patentee's misleading misconduct, and material prejudice if the patentee is permitted to assert any claim inconsistent with its earlier conduct. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041, 1042–43 (Fed.Cir.1992). Lucas argues that it was error for the Court to grant Unison's motion "where an alleged patent infringer has detrimentally relied on a patentee's intentionally misleading silence, as in the present case." D.I. 394 at 58. Lucas bases its argument on its contention that Unison actively encouraged use of its diagnostic patents as an industry standard and did not inform the industry of the patents.

In the cases cited by Lucas in support of its argument, the patentees generally participated in an industry standard making process and advocated the adoption of an industry standard which would prohibit all but the patentee from conforming to the standard without infringing the patent. Despite having an affirmative duty under the rules of the industry standardization committee to disclose patented technology promoted for adoption as the industry standard, the patentees in those cited cases did not disclose to the standards committee that they held an adverse patent. *See, e.g., Stambler v. Diebold, Inc.*, 11 U.S.P.Q.2d 1709, 1715, 1988 WL 95479 (E.D.N.Y.1988) ("[P]laintiff sat on an ... [ANSI] standards committee after concluding the proposed ... standards infringed his patent.... [and] had a duty to speak out and call attention it his patents."); *Potter Instrument Co., Inc. v. Storage Tech Corp.*, 207 U.S.P.Q. 763, 766, 1980 WL 30330 (E.D.Va.1980) ("The [ANSI] Subcommittee had a written policy, of which all members were aware, stating that when any one or more patents are to be included within a proposed industry standard, the owner of such patent[s] must bring to the attention of the Subcommittee the existence of such patents....") (second brackets in original), *aff'd on other grounds*, 641 F.2d 190 (4th Cir.), *cert. dismissed*, 453 U.S. 923, 102 S.Ct. 17, 69 L.Ed.2d 1006 (1981), *and cert. denied*, 454 U.S. 832, 102 S.Ct. 130, 131, 70 L.Ed.2d 110 (1981).

Equitable estoppel applied in the cases cited by Lucas because once the industry standard was established, all members of the industry had to conform their purchases to that standard. In contrast, Unison convinced one customer, Garrett, to adopt the product specification that matched Unison's patents. This presents a far different scenario than the national industry standards cases. Unison did not advocate use of its patent as an industry standard, nor did its customer, Garrett, create an industry standard when it adopted Unison's specification; the Garrett specification applies only to exciters for one Garrett engine program. Gar-

rett had a choice to adopt a diagnostic specification or not; once adopted, Garrett continued to have the choice to maintain or change the specification. In contrast, setting an industry standard, not unlike the formulation of Restatements of Law, involves a long and arduous process with participation from all members of an industry. Once the standard is set it is not so easily changed.

Further, Lucas presented no evidence indicating Unison acted in a manner, misleading or not, and including silence, that would have justified a belief on the part of Lucas that Unison would not enforce its patents. *See A.C. Aukerman & Company v. R.L. Chaides Const. Co.*, 960 F.2d at 1043 ("Properly focused, the issue here is whether Aukerman's [Unison's] course of conduct reasonably gave rise to an inference in Chaides [Lucas] that Aukerman [Unison] was not going to enforce . . . [its] patents against Chaides [Lucas].") (citations omitted). On the evidence presented at trial, however, Lucas cannot successfully assert that Unison caused it to believe Unison would not enforce its patents against Lucas.

Likewise, the Court finds as a matter of law no duty on the part of Unison to disclose existence of its patent to other manufacturers who may have wished to bid on and supply ignition products to Garrett. *See id.* at 1043–44 ("Moreover, silence alone will not create an estoppel unless there was a clear duty to speak, . . . or somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested.") (citations omitted); *cf. Potter Instrument Co. v. Storage Tech. Corp.*, 207 U.S.P.Q. at 769 (resting its estoppel holding on the plaintiff's failure to disclose its patent despite its duty to disclose the patent). The Court can identify no principle of law that would require Unison to disclose its patent to all potential igniter suppliers. Without such a duty running between Unison and Lucas, the Court also cannot conclude that there was any misleading conduct on the part of Unison

that would justify a belief in Lucas that the patent would not be enforced.

Additionally, the Court cannot find any reliance on Unison's conduct or prejudice to Lucas in allowing Unison to enforce its patent. Unison can only sell its product to engine manufacturers if the engine manufacturers adopt the specification that coincides with the product offering by Unison. If a competitor wishes to supply the same product, that competitor, as in any other commercial setting, must be cognizant of any patents that may confer upon the patent owner the right to exclude from the market others desiring to make the patented device. If a patent does prevent parties such as Lucas from supplying a product, it is incumbent upon those parties to take the necessary steps to avoid infringing, such as acquiring a license from the patent owner, designing around the patent, or deciding not to bid or attempt to supply the infringing product. To prevent the patentee such as Unison working with a customer to create a specification as Lucas desires to do in this case ignores a reality of commercial dealings and has the potential to upset the utility of the patents in a commercial setting. For all these reasons, the Court concludes that it made no errors in granting Unison's motion for judgment as a matter of law.[13]

## V. TRIAL RULINGS

■ Lucas concludes its briefing by requesting a new trial on the ground that "the limitations on time the Court set at the outset of the trial caused substantial prejudice to Lucas Aerospace." D.I. 394 at 62. At the Pre–Trial Conference, the parties variously estimated that the trial would take between 12 and 16 days to try. After reviewing the Joint Pre–Trial Order and drawing on 20 year's experience garnered as a presiding district court judge, the Court, in is discretion, estimated that this case could be tried in a total of 10 days, but gave the parties 12 trial days, evenly split between the two parties at 36 hours per side. As early as the

---

**13.** Finally, because the Court finds no error in granting Unison's motion for judgment as a matter of law on the equitable estoppel issue, the Court does not address Lucas's arguments that

the Court should find as a matter of law that Lucas is equitably estopped from asserting its diagnostic patents.

Pre–Trial Conference, the Court warned both sides against squandering their time by introducing tangential evidence and by failing to carefully organize their case before the jury. *See* D.I. 340.

When trial began, the Court implemented a timekeeping system designed to apprise the parties of the time they had used and they had remaining on a daily basis. Despite the Court's warnings at the Pre–Trial Conference, however, the parties both wasted numerous hours with disorganized exhibits, unfocussed examinations, and incoherent presentations of the evidence. Lucas, for example, presented its infringement case for the Labo patent in 1½ days, yet failed to offer expert testimony on infringement, evidence that Unison made, used, or sold infringing devices in the United States, *see* D.I. 334–35, or even to offer the Labo patent into evidence. When the Court granted Unison's motion for judgment as a matter of law after Lucas rested its case-in-chief, Lucas had squandered a significant portion of its trial time.[14] Unison faired little better. Despite the Court's warning to Unison that it should be prepared to proceed with its case-in-chief on day two of trial, Unison was unprepared to go forward after the court granted its motion for judgment as a matter of law on the Labo patent and lost three trial hours in the process. Nevertheless, the Court repeatedly warned both sides that an organized trial presentation *would* be feasible within the allotted time.[15] *See, e.g.,* D.I. 404 at 317–320; D.I. 403 at 770; D.I. 405 at 1366–69; D.I. 406 at 1763–70.

Lucas also complains about being placed in a dilemma with regard to reopening its Labo case. The Court's decision to permit Lucas to reopen its Labo case, and the Court's concomitant decision to allow Lucas to do so only within the confines of its existing trial presentation, arose when the Court became aware that the deficiencies in Lucas's Labo case may have been caused by the illness of its lead trial attorney. That illness does not excuse Lucas's remaining four trial counsel from failing to recognize, and correct, the deficiencies in Lucas's case before Lucas rested. Nonetheless, in the exercise of the Court's discretion, it permitted Lucas to re-open its Labo case. Any time constraints from having to complete the defense to Unison's patents and to reopen the Labo case stemmed from Lucas's failure to present its Labo case and its defense expeditiously in the first instance. Lucas's failure to present its case expeditiously, not the Court's attempt to deal fairly with both Lucas and Unison, created Lucas's time dilemmas.

Indeed, Lucas cannot now contend that it was prejudiced by anything other than its own conduct. Sitting through the trial, the Court concludes that it could have taken as little as 10 days to present all the relevant and important evidence. The Court provided ample guidance to the parties so that they could present their evidence in an efficient manner and not overlap the Court's and jury's valuable time with disorganized, incoherent, and at times unmeritorious presentation. This guidance, the Court notes, came at the Court's expense, not from the parties trial presentation time.[16] Prejudice, if any, suffered by Lucas was caused by Lucas and its handling of its case before the jury. The Court finds no grounds on which to grant Lucas's motion for a new trial.

## VI. CONCLUSION

For the reasons stated above, the Court will grant Unison's motion for judgment as a matter of law and will modify the judgment

---

**14.** The Court notes that Lucas has chosen not to contest in its post-trial motions the merits of the judgment as a matter of law that found Unison does not infringe the Labo patent, except to the extent Lucas feels prejudiced by the time limitations placed on the parties.

**15.** Use of documents also presented an ongoing problem for counsel on both sides. Despite the Court's suggestion that each party prepare a trial notebook so that the jurors could easily follow the important evidence, the parties often wasted time either because the parties had provided no exhibit books, because the exhibit book reference was inconsequential, flipping back and forth between multiple exhibit books to understand the testimony, or, because by the end of the trial, the jurors had to contend with eight notebooks of documents containing overlapping and duplicative exhibits.

**16.** The Court gave the parties at least 4½ to 5 hours "free" time during the course of the trial.

appropriately. The Court will deny Lucas's motion for judgment as a matter of law and its motion for a new trial in all regards.